## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KHAYRI WILLIAMS, | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No. 5:23-cv-01512-JDW** |
| | : | |
| DARWIN WAGNER, et al., | : | |
| **Defendants.** | : | |

### MEMORANDUM

Three officers from the Easton Police Department have the receipts to defeat Khayri Williams's excessive force claims against them. Indeed, the clear video footage from three different officers' body cameras contradict Mr. Williams's version of events and demonstrate that the officers acted reasonably while interacting with him in his cell. Thus, they are entitled to summary judgment.

## I.      BACKGROUND

### A.      Factual History

On October 23, 2022, officers from the Easton Police Department responded to a domestic incident at Cierra Stocker's home in Easton, Pennsylvania. The victim told officers that Mr. Williams had punched her and choked her. Mr. Williams was no longer in the home when by the time officers arrived. A short while later, Ms. Stocker arrived home and called police to report an unwanted visitor at the home: Mr. Williams. Again, Mr. Williams left the house before the police arrived, but officers located him nearby. Officer Justin Winters advised Mr. Williams that Ms. Stocker did not want him at the home, and, as a

result, the police would arrest him for trespassing if he returned. About an hour later, Mr. Williams came back to the home, and Ms. Stocker called the police. When they arrived, Officer Winters saw Mr. Williams jumping from the roof onto the ground. Mr. Williams fled into a neighboring yard, and officers caught him in an alley. Officer Winters put Mr. Williams into handcuffs without incident.

However, as the officers started directing Mr. Williams to the police car, he started to resist. For example, he stopped walking and tried to go back towards a bag he had dropped in the alleyway. He also kicked at several wooden planks, causing them to fall, with some falling into Officer Thomas Spray. Mr. Williams threatened to headbutt Officer Winters and then carried out his threat. Mr. Williams tried to do this at least two more times while they walked to the car. Officer Winters attempted to search Mr. Williams, and Mr. Williams started to resist and "mule kicked" him. Mr. Williams continued to resist by kicking at officers while they attempted to get him into the back of the police car. Mr. Williams kicked the car door multiple times after it was shut.

Once Mr. Williams arrived at the police station, he continued to be uncooperative. He taunted the officers and used homophobic slurs towards them. While officers attempted to search him, Mr. Williams stiffened his body, making the search more difficult. Officer Winters moved Mr. Williams into a cell, comprised of three cinderblock walls and a floor-to-ceiling chain link fence. Once inside the cell, Officer Winters twice directed Mr. Williams to turn around, so he could remove the handcuffs. Mr. Williams refused and

resisted Officer Winters's attempts to turn his body so that he could remove Mr. Williams's handcuffs. Officer Winters used force to turn Mr. Williams's body and pushed him against the fencing. At that point, he was able to remove the handcuffs from Mr. Williams.

Once Mr. Williams turned around, Officer Timothy Wagner, who was also in the cell, directed him to remove his watch, pursuant to Department policy.[1] Instead, Mr. Williams sat down on a bench in the cell. Again, Officer Wagner directed him to turn over his watch, to which Mr. Williams replied: "Get out of my face, bro." Officer Wagner told Mr. Williams that he could either take the watch off himself, or Officer Wagner would do it for him. Mr. Williams refused to take the watch off and placed his right arm behind his back to keep his wrist out of Officer Wagner's reach. For a fourth time, Officer Wagner directed Mr. Williams to take off the watch. Then, he grabbed Mr. Williams's right arm, bringing it forward, and held onto Mr. Williams's wrist with one hand, while he removed the watch with the other. Mr. Williams continued to resist throughout.

While Officer Wagner removed the watch, Officer Winters used one hand to restrain Mr. Williams's left arm, and he used his other hand to apply pressure to Mr. Williams's mandibular nerve, to keep him seated on the bench. Once the watch was off, the officers loosened their grip somewhat. At that point, Mr. Williams rose from the bench,

---

[1] The relevant policies mandate that "[t]he processing officer shall remove all personal property and itemize the property on the prisoner Property Inventory Envelope" and that the officer take special care "to ensure that no detainee is placed in a cell while in possession of any item … which may be used to harm themselves or others, or used for escape purposes." (ECF No. 20-6 at 4.12.08(A)(1)(c), (d).)

lunged at Officer Winters, swung his right arm at Officer Wagner's face, and twisted his body to free his left arm from Officer Winters's grasp. All the while, he yelled homophobic slurs and other profanity at the officers.

Officer Wagner used force to pin Mr. Williams's head against a wall of the cell briefly, and then he and Officer Winters physically forced Mr. Williams into a seated position on the bench. Officer Wagner continued to apply force to keep Mr. Williams seated while Officer Winters handcuffed one of Mr. Williams's hands to the bench.

From the moment Mr. Williams entered the cell until the time the officers left, approximately two minutes and five seconds passed. At no point did Officer Winters or Wagner punch Mr. Williams or strike him in the back with their elbows or knees. In addition, Officer Spray never entered the cell or used any force against Mr. Williams.

Following the arrest, Northampton County, Pennsylvania charged Mr. Williams with aggravated and simple assault, criminal trespass, resisting arrest, harassment, disorderly conduct, and strangulation. These charges stemmed from the underlying incidents, as well as his post-arrest conduct.

### B.    Procedural History

On April 18, 2023, pursuant to 42 U.S.C. § 1983, Mr. Williams filed a Complaint against Officers Spray, Wagner, and Winters (the "Officers"), and a John Doe "supervisor," alleging that they violated his constitutional rights by using excessive force against him. His claims are based on the officers' conduct "[w]hile in the holding cell in the Easton

Police Department ....." (ECF No. 2 at page 5 of 11.) He alleges that the officers punched him in the head and elbowed and kneed him in his back while restraining his left arm and pinning him against the wall. In turn, Officers Winters and Wagner asserted counterclaims against Mr. Williams for assault and battery. Following discovery, the Officers moved for summary judgment on Mr. Williams's claims, and provided video footage from Officer Wagner's, Officer Spray's, and Officer Ryan Boorstein's body cameras.[2] Mr. Williams did not file a response in opposition, and the Officers' motion is ripe for disposition.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). When video footage is part of the evidentiary record, a court should view the facts "in the light depicted by the videotape." *Id.* at 381.

To overcome summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record

---

[2]      In his report, Officer Winters noted that when he arrived at Ms. Stocker's house the third time, he reached to turn on his body camera, but the camera did not turn on.

there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If he fails to make this showing, then the court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## III.    DISCUSSION

Because he is pretrial detainee, Mr. Williams's excessive force claim arises under the Fourteenth Amendment.[3] *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) To prevail on this claim, Mr. Williams "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389,

---

[3]    Mr. Williams claims that by using excessive force, Officers violated the Fourth Amendment, which "protects citizens from objectively unreasonable uses of force in the context of arrests, investigatory stops, or any other seizure." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 (3d Cir. 2021) (citations omitted). But Mr. Williams was a pretrial detainee at the time of the alleged violation, and "[t]he Supreme Court has not yet determined whether pretrial detainees can bring excessive-force claims under the Fourth Amendment." *Id.* at 194 n.4. Even if Mr. Williams could raise an excessive force claim under the Fourth Amendment, the result would be the same, because "the Fourteenth Amendment standard is now almost identical to the Fourth Amendment standard." *Jacobs*, 8 F.4th at 195 n.6 (3d Cir. 2021).

396–97 (2015). Determining whether an officer's use of force was objectively unreasonable "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quotation omitted). The factfinder "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* In addition, the judge or jury should "defer[] to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quotation omitted).

Various factors may bear on whether the use of force was reasonable, including but not limited to "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* The totality of the circumstances in this case demonstrates that a reasonable jury would never determine that the Officers' conduct was objectively unreasonable.

Although Officer Winters was able to handcuff Mr. Williams without incident, Mr. Williams became combative and resistant immediately thereafter, kicking over wooden planks, headbutting and mule-kicking Officer Winters, and kicking his legs at the Officers as they tried to get him into the police car. Upon arrival at the station, Mr. Williams continued to be combative towards the Officers, stiffening his body and making it difficult for them to search him. Once inside the cell, Mr. Williams took a defiant stance after

Officer Winters twice instructed him to turn around so that the Officer could remove the handcuffs. There was no reason for Mr. Williams to refuse that directive, other than for the sake of defiance. Once Mr. Williams ignored Officer Winters's repeated directives and made clear he would not turn around on his own, it was not objectively unreasonable for Officer Winters to use a minimal amount of force to turn Mr. Williams around and push him against the fencing so that he could remove the handcuffs.

Likewise, it was not objectively unreasonable for Officer Winters and Officer Wagner to restrain Mr. Williams so that Officer Wagner could remove Mr. Williams's watch. Indeed, Officer Wagner directed Mr. Williams to remove his watch four times before doing it himself. He also warned Mr. Williams that if he did not take the watch off himself, Officer Wagner would forcibly remove it. However, rather than comply with these repeated directives, Mr. Williams took a childish approach and placed his right arm behind his back, forcing Officer Wagner to reach around and grab his arm. Officer Winters's application of pressure on the side of Mr. Williams's neck and Officer Wagner's grip on Mr. Williams's wrist lasted only a few seconds, until Officer Wagner could remove the watch. The video evidence contradicts Mr. Williams's allegation that the Officers punched him in head and choked him while removing his watch. None of the three videos shows any Officer punching or choking Mr. Williams.

Once the watch was off and the Officers loosened their restraint, Mr. Williams tried to take advantage of the freedom of movement, lunging at Officer Winters and twisting

and turning his body to resist the Officers. At one point, his right arm became loose, and he swung his fist at Officer Wagner. Given this active, physical resistance, it was not objectively unreasonable for Officer Wagner to pin Mr. Williams's head against the wall of the cell until he complied with the directive to sit back down. The video evidence contradicts Mr. Williams's allegation that the Officers punched him in head, elbowed, and kneed him in his back while restraining him. None of the three videos shows any Officer doing any of these things. Officer Wagner pinned Mr. Williams's head against the wall briefly, but he did not strike or punch him.

By this point in time, Mr. Williams had displayed a consistent pattern of refusal to follow commands and active resistance. The entire encounter in the cell lasted little more than two minutes, and in the footage, Mr. Williams does not have any visible injuries; nor does he complain of any pain. Instead, he continues to berate and taunt the officers with profanity and vulgar statements.

Viewing this evidence in the light most favorable to Mr. Williams, no reasonable finder of fact could view the video of the incident and determine that any of the Officers acted unreasonably. That is especially true for Officer Spray, who was not even in the cell with Mr. Williams. On the contrary, a reasonable jury would conclude that force was reasonable based on the totality of the circumstances (i.e. the underlying crimes that Mr. Williams was charged with, his headbutting and kicking of Officers, his combative

behavior, his repeated refusals to comply with directives, the short duration of the force, and the lack of a visible injury).

## IV.     CONCLUSION

Because Mr. Williams's version of events is contradicted by the clear video footage of Officers Winters's and Wagner's brief and reasonable use of force against him, his excessive force claim cannot proceed, and the Officers are entitled to summary judgment. An appropriate Order follows.

BY THE COURT:

_/s/ Joshua D. Wolson_
**JOSHUA D. WOLSON, J.**

April 23, 2024